**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| BENJAMIN LAPIN AND MARGARET LAPIN, derivatively on behalf of ORGANON & CO., Plaintiffs, | Case No. |
| v. | |
| CARRIE S. COX, ROBERT ESSNER, ALAN EZEKOWITZ, HELENE GAYLE, ROCHELLE B. LAZARUS, DEBORAH LEONE, PHILIP PZUAH, CYNTHIA M. PATTON, GRACE PUMA, RAMONA SEQUEIRA, SHALINI SHARP, KEVIN ALI, and MATTHEW WALSH, Defendants, | **JURY TRIAL DEMANDED** |
| -and- | |
| ORGANON & CO., Nominal Defendant. | |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Plaintiffs Benjamin Lapin and Margaret Lapin ("Plaintiffs"), derivatively on behalf of Organon & Co. ("Organon" or the "Company"), bring the following complaint against the Company's board of directors (the "Board") and executive officers for breaches of fiduciary duties, gross mismanagement, waste of corporate assets, unjust enrichment, and violation of Section 14(a) of the Securities Exchange Act of 1934. Except for allegations specifically pertaining to Plaintiffs and Plaintiffs'

own acts, the allegations in the Complaint are based upon information and belief, which include but are not limited to: (i) the Company's public filings with the United States Securities and Exchange Commission (the "SEC"); (ii) pleadings filed in *In re Organon & Co. Securities Litigation*, Case No. 2:25-cv-005322-JXN-CF (D.N.J.); (iii) confidential documents produced to Plaintiffs in response to a demand for inspection of books and records pursuant to 8 *Del. C.* § 220; (iv) corporate governance documents available on the Company's website; (v) media reports; and (vi) other publicly available information.

## NATURE OF THE ACTION

1. This is a stockholder derivative action brought by Plaintiffs, stockholders of Organon, on behalf of the Company against the Defendants, as defined herein. This action alleges breaches of fiduciary duty by the Board and senior executive officers occurring from at least November 3, 2022, to October 26, 2025 (the "Relevant Time Period"). During that time the Defendants caused or allowed Organon to issue or make materially false and misleading statements concerning the Company's financial condition and business operations.

2. Organon spun off from Merck & Co., Inc. ("Merck") in 2021, to "focus on improving the health of women throughout their lives." In 2021, the Company had a portfolio of women's health products, which included contraceptive and fertility products, as well biosimilar immunology and oncology treatments and

"established brand" products. That year, women's health products accounted for approximately 26% of Organon's sales, while established brand products accounted for two-thirds of total sales in 2021. In 2025, women's health products accounted for approximately 28% of Organon's sales, and established brand products accounted for 60% of sales.

3. There is one product in the women's health segment that outperforms the others: Nexplanon, a long-acting reversible contraceptive. Nexplanon is implanted under the skin of the upper arm and can be removed at any time. Before January of this year, Nexplanon was approved for use up to three years; now, Nexplanon can be used for up to five years. In 2025, Nexplanon brought in $921 million in sales, 62% of all sales in the segment. Before 2025, Nexplanon sales grew substantially, from $769 million in 2021 to $963 million in 2024. Organon attributed Nexplanon's growth to increased demand in the United States. Given its history of growth and increased demand, as well as the Company's expectation that Nexplanon would be protected from generic competition until at least 2027, Organon led investors and the public to believe that Nexplanon would reach $1 billion in sales by 2025.

4. Nexplanon was not just an important product in the Company's portfolio. Sales of Nexplanon contributed significantly to Organon's free cash flow. One analyst attributed up to two-thirds of Organon's free cash flows to Nexplanon.

Increased sales of Nexplanon would increase free cash flow, which was needed to continue paying dividends to investors. And for executive officers, increased free cash flow meant receiving large grants as part of the Company's long-term incentive compensation program.

5. Secretly, during the Relevant Time Period, certain employees at Organon, including the then-Chief Executive Officer, engaged in "channel stuffing": they pressured wholesalers to purchase more Nexplanon than needed in exchange for waived inventory management fees. The Company disclosed this scheme to investors in October 2025 and admitted that there were material weaknesses in the Company's internal control over financial reporting as of December 31, 2024. Organon claimed that the incremental sales represented less than 1% of the Company's consolidated revenue for the years during which the misconduct occurred, and that no restatement or revision of previously issued financial statements would be necessary.

6. While the Company dismissed the financial impact of the channel stuffing scheme, it would have had a significant impact on executive compensation. That is, had the Company not committed fraud to inflate Nexplanon's sales, executive officers at Organon would not have received tens of millions of dollars in equity incentive compensation.

7. During the Relevant Time Period, the Company and Defendants also made false and misleading statements about the Company's internal controls over financial reporting, sales of Nexplanon, the vulnerable position Nexplanon was in concerning generic competition, and the impact of the channel stuffing scheme on the Company's ability to continue making its sizeable dividends.

8. On May 1, 2025, Organon announced it would reduce the quarterly shareholder dividend more than 90%, from $0.28 per share to $0.02 per share. In an earnings call that same day, Organon's senior management acknowledged that the Company could not afford to pay such a large dividend, citing the need to acquire new products and pay down debt.

9. The next day, the Company disclosed that it had sued a rival pharmaceutical company, Xiromed LLC ("Xiromed"), for seeking to produce and sell a Nexplanon generic. Organon's complaint revealed not only Xiromed's pending application with the U.S. Food and Drug Administration ("FDA") for approval, but that the Company had known since before the start of the Relevant Time Period that the FDA would allow competitors to use just six months of clinical data in their bid for approval. This was contrary to what the Company had told investors: that any generic competitor would need to show three or five years of clinical data. A shorter time frame meant that it was much easier for generic

competitors to begin selling their version of Nexplanon, in turn depressing sales of Nexplanon.

10. Finally, on October 27, 2025, Organon disclosed the channel stuffing scheme, the failure of its internal controls over financial reporting, and the resignation of the then-Chief Executive Officer.

11. Through this action, Plaintiffs seek to hold the Board and executive officers accountable for making or causing the Company to make false and misleading statements, as well as the inadequate internal controls that allowed the misconduct to occur, in breach of their fiduciary duties to the Company.

## PARTIES

### A. Plaintiffs

12. Plaintiffs Benjamin Lapin and Margaret Lapin are current shareholders of Organon and have continuously held Organon stock during all times relevant hereto and are committed to retaining Organon shares through the pendency of this action to preserve their standing. Plaintiffs will adequately and fairly represent the interests of Organon and its shareholders in enforcing its rights.

### B. Nominal Defendant

13. Nominal Defendant Organon is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices

are located at 30 Hudson Street, Floor 33, Jersey City, New Jersey 07302. Organon common stock trades on the NYSE under the ticker symbol "OGN."

**C. Individual Defendants**

14. Defendant Carrie S. Cox has been a director of the Company since 2021. Defendant Cox has served as Executive Chair of the Board since October 26, 2025.

15. Defendant Robert Essner has been a director of the Company since 2021.

16. Defendant Alan Ezekowitz has been a director of the Company since 2021.

17. Defendant Helene Gayle has been a director of the Company since 2021.

18. Defendant Rochelle B. Lazarus has been a director of the Company since 2021.

19. Defendant Deborah Leone has been a director of the Company since 2021.

20. Defendant Philip Ozuah has been a director of the Company since 2021.

21. Defendant Cynthia M. Patton has been a director of the Company since 2021.

22. Defendant Grace Puma served as a director of the Company between 2021 and June 9, 2026.

23. Defendant Ramona Sequeira has been a director of the Company since July 2025.

24. Defendant Shalini Sharp has been a director of the Company since 2021.

25. Defendants Cox, Essner, Ezekowitz, Gayle, Lazarus, Leone, Ozuah, Patton, Puma, Sequeira, and Sharp are herein referred to as "Director Defendants."

26. Defendant Kevin Ali served as Chief Executive Officer and a director of the Company from 2021 until October 26, 2025.

27. Defendant Matthew Walsh has served as Executive Vice President and Chief Financial Officer of the Company since 2021.

28. Defendants Ali and Walsh are herein referred to as "Officer Defendants."

## JURISDICTION AND VENUE

29. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

30. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

31. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

32. Venue is proper in this court under 28 U.S.C. § 1391, because Organon is headquartered in this District, and a significant amount of the conduct at issue took place and had an effect in this District.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A. Background

33. Organon began in 1923 as Zwanenberg-Organon, a Dutch pharmaceutical company. The Company was known for its innovative women's health products like desogestrel, a compound commonly used in birth control pills, and NuvaRing, a contraceptive device. Organon was acquired by Schering-Plough in 2007, which was itself acquired by Merck in 2009.

34. On February 5, 2020, Merck announced its intent to spin off products from its Women's Health, Legacy Brads, and Biosimilars units into a new company.

On March 11, 2020, Merck announced that the new company would be named Organon & Co. The press release announcing the naming of the new company linked the prior Organon's focus on women's health to the new company, stating that the "Organon name has strong brand equity and engenders great respect among health care professionals for its dedication and innovation in women's health." Defendant Ali, named as the Chief Executive Officer of the new company, stated: "Organon will set a new direction for the future of women's health bringing new hope and treatments worldwide . . . ."

35. Defendant Ali emphasized the Company's focus on women's health products in the lead-up to Organon's official spin-off from Merck, positioning Nexplanon as a core driver of the Company's future growth. For example, in a June 3, 2021, interview with industry publication Fierce Pharma, Ali proclaimed that Organon would give the Women's Health portfolio a "prioritization and focus" that was lacking at Merck, a company known for its focus on vaccines and cancer treatments. Ali connected the new company to the legacy of the original Organon, stating: "OB-GYNs . . . have incredible respect and incredible memories for the name of Organon[.] So we brought back Organon on a version 2.0 because we wanted the world to know what we were about." At the end of the interview, Ali emphasized the new Organon's women's health focus even more explicitly, stating: "This is a women's health company[.] We feel that the world needs a company that

is not watered down but focused on women's health and solving these needs. And that vision and that passion and that purpose is what drives us."

36. As part of its focus on women's health, Organon promoted Nexplanon as the cornerstone of the Company's future success. During a call with analysts and investors on October 31, 2024, Defendant Ali told investors that Nexplanon was the Company's "largest product" and contributed to Organon's "very strong" commercial execution in the 2024 fiscal year. During a call with analysts and investors on February 13, 2025, Defendant Ali told investors that the Company was "very optimistic about the future [of Nexplanon.]" The Company and the Defendants repeatedly predicted that Nexplanon would reach $1 billion in annual revenue in 2025.

37. The Defendants did not just want Nexplanon sales to grow, they needed them to. Nexplanon sales were the main contributor to Organon's free cash flows, which were how the Company paid its dividends. But free cash flows were also a key element of the Company's executive compensation program. Any decrease in Nexplanon sales would likely decrease dividends and the amount of stock awards received by executive officers.

38. Beginning in the third quarter of 2021—the Company's first fiscal quarter as a publicly traded company—Organon began paying a shareholder dividend of $0.28 per share. Compared to other pharmaceutical companies,

Organon's dividend was quite substantial. The dividend yield, the ratio of the annual dividend per share to Organon's share price, at times exceeded that of dividends paid by other pharmaceutical companies. In 2022, for example, Organon's dividend yield was roughly 4.18%, which was greater than the dividend yield paid by AbbVie (4.1%), Pfizer (2.9%), and Johnson & Johnson (2.55%).

39. The Defendants touted the dividend as proof of the long-term stability of the Company's cash flow. As Defendant Walsh told investors in a call to discuss Organon's financial results for the third quarter of 2021, the Board's decision to pay the dividend reflected that Organon "generates strong cash flow today." Defendant Walsh further described the dividend as Organon's "number one [cash allocation] priority." This refrain was repeated throughout the Relevant Time Period. For example, during a call with analysts and investors on February 15, 2024, Defendant Ali stated that the Company was "very committed to be able to service our dividend."

40. Organon's ability to continue paying the dividend was directly tied to Nexplanon sales. During the Relevant Time Period, sales of Nexplanon were the Company's largest generator of free cash flow, which it used to pay the dividend. A decrease in Nexplanon sales would negatively impact free cash flow, which would in turn decrease the capital available to make dividend payments.

41. The Company's executive officers had another incentive for ensuring that Nexplanon sales stayed the course. As part of Organon's executive

compensation program, executive officers receive a base salary, a target annual cash incentive, and target long-term equity incentive ("LTI"). In 2022, half of the LTI awards were performance share units ("PSUs") that are granted if the executive officer meets specific performance goals. In 2022, 38% of Defendant Ali's total compensation consisted of PSUs, and Defendant Walsh had 34% of his total compensation as PSUs. That year, the PSUs would be granted based on meeting a specific three-year cumulative free cash flow target, which was weighted at 70%. That is, 70% of the total PSUs grant depended on meeting the three-year cumulative free cash flow target. Similarly in 2023, three-year free cash flow was weighted at 70% of the total PSUs grant. The weight dropped to 50% for 2024 and 2025.

42. The impact on the compensation earned by executive officers was profound. In 2022, Defendant Ali was granted $6.4 million in PSUs, and Defendant Walsh was granted $2.3 million in PSUs. The performance period of those PSUs was from January 1, 2022, to December 31, 2024. The Company met the threshold amount of three-year cumulative free cash flow, but not the target amount. After weighting, the PSUs vested at 58.75%. In 2023, Defendant Ali was granted $5.5 million in PSUs and Defendant Walsh was granted $1.7 million in PSUs. The performance period of those PSUs was from January 1, 2023, to December 31, 2025. The Company met the threshold amount of three-year cumulative free cash flow, but not the target amount. After weighting, the PSUs vested at 58.01%. In 2024,

Defendant Ali was granted $6.4 million in PSUs and Defendant Walsh was granted $1.9 million in PSUs. Finally, in 2025, Defendant Ali was granted $7 million in PSUs and Defendant Walsh was granted $2 million in PSUs.

43. In total, Defendants Ali and Walsh were granted more than $33 million in PSUs that were dependent on the Company's free cash flows. Those free cash flows were themselves dependent on Nexplanon sales. The executive compensation program thus incentivized Organon's executive officers to ensure that Nexplanon sales continued apace.

## B. Organon's False and Misleading Statements

44. Aware of the crucial role of Nexplanon's sales to paying dividends and executive compensation, the Company and the Defendants downplayed, dismissed, or omitted to mention risks to Nexplanon's future sales throughout the Relevant Time Period. These false and misleading statements failed to inform the public and investors about the true status of Organon's current and prospective financial health.

### 1. Organon's False and Misleading Statements About the Risk Posed by Generic Competitors

45. The Company holds patents on both the device and the applicator used to insert the device, and those patents are set to expire in 2027 and 2030, respectively. Once the patents expire, companies can file an application with the FDA to sell generic versions of the device and applicator. As part of the application,

the companies must show that their device performs similarly to Nexplanon, using data covering a specific amount of time.

46. On August 5, 2022, the FDA issued Draft Guidance addressing the approval process for generic Nexplanon products. The Draft Guidance stated that a potential generic competitor had to provide just six months of data showing comparable results to Nexplanon. As the Draft Guidance reflected the FDA's views on what would be necessary to be granted approval for a generic product, it revealed that Nexplanon would likely face more competition and much earlier than previously believed. Indeed, as long as the generic product does not violate either patent, a Nexplanon competitor could receive FDA approval far earlier than 2027 or 2030.

47. The Company and Defendants did not disclose the risk of generic competition to Nexplanon at that time. Instead, they made statements that ignored or even downplayed the possibility that generic competitor products could enter the market before the patents expired.

48. In a call with analysts and investors on May 4, 2023, Defendant Ali stated, in response to a question about the Company's strategy on replacing Nexplanon when its patents expire:

> But on the other topic of Nexplanon, the LOE in the United States is 2027. But as I mentioned a number of times before, the entire kind of erosion model for Nexplanon, I would probably look and start to look at a benchmarking, say, for example, Mirena from Bayer as kind of the situation, because it's a device that has [a] drug-eluting device, it's a very difficult product to manufacture, and all of the other downstream

> investments that need to be made in terms of training, in terms of pharmacovigilance, in terms of all the other things that go along with the complexities of managing something like a Nexplanon in terms of your own applicator device. So, we still believe that Nexplanon is not going to resemble what you might have in your models in terms of the standard kind of historical erosion rates. And so, those two together, I think, kind of signal that we're on the right path going forward.

49. Defendant Ali attended the Piper Sandler Healthcare Conference on November 29, 2023. In response to a question about Nexplanon's slower-than-expected sales growth, Defendant Ali stated: "we have plenty of runway ahead of us before LOE to be able to create the kind of, as you say, volume uptick that we think this [product] deserves."

50. On February 15, 2024, the Company held a conference call with analysts and investors to discuss the financial results for the fourth quarter of 2023. In his opening remarks, Defendant Ali stated that "[a]t the end of 2024, we anticipate having Phase III data from our 5-year study," and, if approved, "will give Nexplanon 3 years of exclusivity in the 5-year efficacy claim in the U.S. market" and "extend the growth ramp well past the $1 billion run rate we are aiming for in 2025."

51. Later during the call, an analyst asked about the possibility of a generic competitor product entering the market before Organon's patent on the Nexplanon device expired in 2027. Defendant Ali stated:

> Yes, Jason, there's nothing that I see from the FDA in terms of guidance around kind of breaking the patent that we have. Clearly, through the end of 2027. But the issue to keep in mind and more importantly, right?

> Whoever announces what their intent is in terms of their focus on where they want to come in next.
>
> The FDA has never approved any complex generic drug during the first cycle review. I mean we expect – historically, it's been anywhere between 2.5- to 4-year approval time line from the initial ANDA submission. I'll give you an example. For us, NuvaRing, which is by far much less complex, by far, by a magnitude of many times than something like NEXPLANON, which is a medicated vaginal ring for contraception.
>
> The first generic received FDA approval after almost a 30-month delay and Teva's NuvaRing, now that you're bringing up Teva, Teva's NuvaRing generic took 8 years to get to the market. If we take that time line, you're talking about a 2030 minimum introduction. And on top of that, we have the – you're going to have to have your own proprietary device.
>
> Our device, our applicator device has patent protection through 2030. So you're going to have to do your own proprietary applicator device design and then launch it. And finally, you're going to have to start investing in sales force and medical affairs people because you need to have people who actually are training physicians in order to be able to insert and remove this product. And keep in mind, finally, this is a buy-and-build product.
>
> This is not a normal product in that respect. It's much more difficult. So I have been saying for years, and I can get into all the intricacies that I do not expect any major issue with NEXPLANON between now and the end of the decade. I do expect that we're going to have the data at the end of this year for the 5-year indication, and we'll be able to launch that probably when we decide in the 2025, 2026 timeframe, which will take essentially exclusivity through the end of the decade.

52. Despite Defendant Ali's insistence that nothing in the Draft Guidance threatened Nexplanon's exclusivity, just days later, on March 5, 2024, Organon filed a Citizen Petition asking the FDA to change its Guidance to require at least three years of data demonstrating that the generic competitor product acted comparably to

Nexplanon. The Company also requested that any Nexplanon generic be required to use applicator and device designs equivalent to those approved for Nexplanon, and that any generic competitor be subject to medical provider training and certification requirements similar to those required for Nexplanon.

53. On August 14, 2024, the FDA issued an Interim Response Letter to the Company's Citizen Petition. The FDA noted that Organon had raised "complex issues requiring extensive review and analysis by Agency officials" and that the FDA would "respond to [the] petition as soon as [it had] reached a decision on [the] request." While the FDA is required by regulation to decide a Citizen Petition within 180 days of receipt, it rarely, if ever, does. Studies have noted that Citizen Petitions can take up to 10 to 13 years to be decided. In the meantime, the FDA's Draft Guidance still stands.

54. On May 2, 2024, the Company held a conference call with analysts and investors to discuss the financial results for the first quarter of 2024. During that call, Defendant Ali stated:

> [B]eyond 2025, we believe there is still significant runway for growth up until the loss of exclusivity for Nexplanon in the U.S., which, in our view, will not occur until 2030 for 3 specific reasons. First, our 5-year study is on track to close this year. And pending FDA review and approval, our planning assumption is that we will be able to market [it] with a five-year label in 2026. A differentiated label will give us three years of data exclusivity on that 5-year duration of use claim, which we know from our market research is preferred by women and providers.

* * *

> This is not just suppositions, a lot of fact that would lead one to believe that this is a 2030 event. Our applicator alone globally has patent protection until 2030, and somebody would have to develop their own applicator, which in itself is not as easy as you may think because you've got to do studies around safety, around efficacy of the applicator device alone before you can actually show anything else in regards to the rod itself. So, I think this is [a] 2030 event globally and beyond.

55. On August 6, 2024, the Company held a conference call with analysts and investors to discuss the financial results for the second quarter of 2024. During the call, Defendant Ali stated:

> With regard to the Nexplanon five-year study, the study met its primary end points, showing contraceptive effectiveness and no new safety signals. Based on this data, we are beginning to prepare for regulatory submission in the US, EU and UK. We continue to believe that would put us on track for a potential[] US launch of the Nexplanon five-year indication in 2026 pending FDA approval. We see this launch as an important event because it would mean that we would have data exclusivity on the five-year claim for three years. That means between 2026 and 2029, no generic with five-year duration could come to the US market; and further, any generic would need to have a different insertion device until our device patent expires in 2030. We remain very optimistic about Nexplanon's future prospects and the expanding potential of the brand.

56. During the same call, Defendant Ali stated that Nexplanon "will continue to be with us in a very robust manner until the end of the decade and possibly beyond just because of the fact, as I mentioned, our inserter device, which is very unique and it is a very clear differentiator, has exclusivity until 2030."

57. Defendant Ali then attended the JP Morgan Healthcare Conference on January 13, 2025. During the conference, Defendant Ali stated:

> Now, if we end up at $1.6 billion, that means essentially [it] will be the biggest contraception [] ever. Essentially, we'll have set the record in that regard as a benchmark. So, going forward, I'm feeling comfortable by 2030 saying that's what I feel comfortable saying.
>
> Beyond that, we'll have to see. But there's a lot of potential longevity. Because as I mentioned before, if you crack the code of being able to get it onto the market, you still need a sales force, medical affairs groups to teach and train physicians on how to insert, how to remove pharmacovigilance, all the things that one would say that you would have with a branded product. So, it's quite an investment to get there.

58. In response to a question about whether he was aware of whether there existed a generic competitor to Nexplanon, Defendant Ali answered in the negative:

> No. I mean I've heard noises and . . . they've kind of gone quiet . . . . [And] remember, by the way, that our applicator device has patent through 2030. So, if somebody wants to come on to the market, they're going to have to do clinical studies on their own proprietary . . . applicator in order to be able to say to the FDA that we've got the applicator now, it's our own proprietary. It takes quite a bit of effort because you have to show no deep vein insertion, you've got to be able to show the efficacy and safety. And that's not an easy thing to do.

59. On February 13, 2025, the Company held a conference call with analysts and investors to discuss the financial results for the fourth quarter of 2024. When asked whether the Company had received a filing indicating a generic competitor's intent to seek FDA approval for a generic version of Nexplanon, Defendant Ali stated:

> [I]n terms of your first question around Nexplanon, no Paragraph IV right now that we've received. And right now, I've been saying for – I don't know, for the last two years, I don't see really any risk to a large degree of a Nexplanon three or five-year for that matter introduction in terms of a generic or biosimilar between now and the end of the decade. After the end of the decade, I mean, then we'll determine what

> happens then. But right now, when I start to see the fact that our applicator device is – got patent protection through 2030, when I start to see that our five-year indication, which we will hopefully launch by the end of this year, we'll have exclusivity through 2029.
>
> If I start to look at all the various issues around a – an implant that has a product in it, there's no precedent there. When I start to think about the benchmarks of either Mirena, a medicated IUD, no generic so far. So, I don't feel we'll see any generics to challenge Nexplanon through 2030. And so, as a result of that, when you start to see that we've got $1 billion expectation in this year, and you put down essentially the growth expected to the end of the decade, you see how big product can be. And it's our most profitable product.

60. Later during the Call, Defendant Ali stated: "you've heard me say many times the reasons to believe and I feel very confident that we won't see, at least until the end of the decade, a competitor for Nexplanon."

61. On February 28, 2025, the Company filed its Form 10-K for fiscal year 2024 with the SEC (the "2025 Form 10-K"). In a section describing business risks, Organon downplayed the risk of a generic competitor to Nexplanon, stating:

> In addition, Nexplanon is an important Organon brand that continues to have good market exclusivity, especially in the United States. This complex drug-device combination has different components with different patent exclusivities. In the United States, patents claiming key aspects of the Nexplanon applicator will expire in 2030 and patents for the Nexplanon rod will expire in late 2027. Patents for the majority of countries where Nexplanon is commercialized outside the United States will expire between 2025 and 2026.

62. Defendants knew of or disregarded the risk that the FDA's Draft Guidance would attract generic competition much sooner than disclosed to investors, who were unaware of the Draft Guidance, Organon's Citizen Petition, and the FDA's

response in August 2024. Failing to disclose this information was a marked departure from its usual practice of disclosing regulatory updates about other products.

### 2. Organon's False and Misleading Statements About its Sales Practices

63. During the Relevant Time Period, the Company and Defendants told the public and investors that Nexplanon would reach $1 billion in annual sales by 2025. However, the Defendants knew that it would be difficult to reach that goal through organic sales alone.

64. On October 31, 2024, the Company issued a press release announcing the financial results for the third quarter of 2024. The press release stated: "In 2024 our commercial execution has been very strong. Our largest product, Nexplanon, is well positioned to deliver $1 billion of revenue next year . . . . Further, we have been extremely disciplined on operating costs and driving Adjusted EBITDA growth in support of achieving $1 billion of free cash flow before one-time costs for full year 2024."

65. The Company held a conference call that day with analysts and investors to discuss the released financial results. In his opening remarks, Defendant Ali stated:

> So let's review the rest of the business in greater detail. Growth in Women's Health was driven by continued strength in Nexplanon, which was up 11% ex-FX in the third quarter. In the US, Nexplanon

> grew 18% in the third quarter. We benefited from Nexplanon's leadership in the US contraception market, our pricing strategy, including management of the 340B discount program, as well as continued physician demand growth outside the US.
>
> Nexplanon was down 3% ex-FX in the third quarter, primarily due to the timing of tenders in Latin America. Given strong year-to-date performance, we expect Nexplanon can achieve constant currency full-year revenue growth in the low- to mid-teens. This would be our best year yet with Nexplanon and positions us extremely well to achieve the $1 billion milestone that we had signaled for the next year.

66. Later during the call, Defendant Ali reiterated the $1 billion goal, stating:

> And then, our Nexplanon business continues to go along very – very well in the US. We're a market leader in the contraception space, especially in terms of LARCs. And we see continued growth not only in terms of demand, but . . . our 340B business is also growing with the federally qualified health centers. There's a great opportunity for us in the future. So we'll reach $1 billion which is faster than I anticipated for Nexplanon globally with US obviously driving a big portion of that in the – for us next year for Organon. And that's our first kind of major blockbuster milestone for the product, and we see a lot of years ahead of it in terms of the runway.

67. Defendant Walsh also emphasized the figure, stating that Organon was "well on track to deliver our commitment of approximately $1 billion of free cash flow" in 2024. Defendant Walsh also stated that the Company had set itself up "to deliver a trifecta of growth in revenue and EBITDA dollars, a leveraged P&L ex-milestones, and $1 billion of free cash flow," adding: "we feel very good about our ability to deliver on that goal."

68. At the end of the call, Defendant Ali stated:

> [I]n 2024, our commercial execution, I believe, has been very strong. Our largest product, Nexplanon, is well-positioned as I mentioned earlier to deliver $1 billion of revenue next year. And we've added other notable growth drivers with Emgality, and most recently, what we've just discussed this morning VTAMA.
>
> Further, we've been extremely disciplined on operating costs and driving adjusted EBITDA growth in support of achieving $1 billion of free cash flow before one-time costs for the full year 2024. So we're well on track to delivering a very solid year and we want to thank you for dialing in today and we'll talk to you soon.

69. Defendant Ali spoke on Nexplanon's sales and growth prospects at the JP Morgan Healthcare Conference on January 13, 2025. When asked about growth drivers, Defendant Ali stated:

> [W]e feel like 2025 will be the year we cross the $1 billion threshold. We'll be in excess of $1 billion in 2025. And we see . . . the runway on this through the end of the decade. So, if you're . . . conservative about mid-single digit growth over the coming period of time until the end of the decade, this is a $1.5 billion, $1.6 billion business.

70. On February 13, 2025, the Company held a call with analysts and investors to discuss the financial results for the fourth quarter of 2024. During the call, Defendant Ali stated:

> Let's move now to discuss the growth drivers within the franchises in 2024. The Women's Health franchise grew 5%, ex-exchange, led by performance of Nexplanon, which was up 17%, ex-FX, for the full year of 2024. This was Nexplanon's best annual performance ever and positions the product to achieve at least $1 billion of revenue in 2025.
>
> In 2024, Nexplanon grew double digit both in the US and in international markets. Outside the US, growth in the LAMERA region was particularly strong, driven by increased demand, tender expansions as well as strong performance in Brazil. We also had a strong growth in the UK where Nexplanon is a market leader.

> In the US, we benefited from Nexplanon's market leadership, coupled with our pricing strategy, which includes management of the 340B discount program, as well as continued growth in physician demand. We remain very optimistic about the future of Nexplanon, especially with the potential of a five-year indication to sustain long-term Nexplanon growth.

71. Later during the call, in response to a question about Nexplanon's revenues, Defendant Ali stated:

> And in 2024, as you rightfully stated, it was the best year that we've actually ever had with 17% growth both outside the US and inside the US. And we'll pretty comfortably get beyond $1 billion in 2025 . . . . But I think it's a prudent way to say, look, just factor in high-single-digit growth through the end of the decade, it'll get you to somewhere in the neighborhood of the $1.5 billion, which again is very different than you see in some of the models out there.

72. The Company held a conference call with analysts and investors on May 1, 2025, to discuss the financial results from the first quarter of 2025. During the call, Defendant Ali stated: "Nexplanon grew double-digit and is set to achieve more than $1 billion in revenue in 2025." Defendant Ali later stated:

> We're doing this from a position in terms of what we've done with the dividend today what we announced from a position of strength. Over the last few years, we have, for example, reestablished Nexplanon, our key product, where we're going to surpass $1 billion this year. We have stabilized the Established Brands business.

73. Also during that call, Defendant Walsh stated:

> Our constant currency guidance remains the same, which is about flat versus prior year at the midpoint. We expect the uptake of Vtama, continued solid performance in Emgality, and organic growth in Nexplanon and other products in our portfolio will help to offset the LOE of Atozet in Europe along with pricing headwinds in other parts of the portfolio. That's a pretty strong statement, given that Atozet's

> LOE represents a headwind of approximately $200 million alone between volume and price.

74. These statements were false and misleading because they failed to disclose that Defendant Ali and other Organon employees were engaging in channel stuffing to increase Nexplanon sales. Beginning in the fourth quarter of 2022, people at Organon pressured two U.S-based wholesalers to pull forward Nexplanon sales that were planned for the following quarter. In exchange, the Company agreed to calculate the wholesalers' inventory management fees as if the sales had not then occurred. This arrangement then repeated from the third quarter of 2024 through to the third quarter of 2025.

75. While the Company claimed that the amounts in question were immaterial, it did admit that without the misconduct, the Company's consolidated revenues would have fallen short of forecasts. That is, the channel stuffing made it appear that the Company was meeting sales guidance for the quarters in which the wholesalers made the inflated purchases.

76. According to the Amended Form 10-K filed with the SEC on November 10, 2025, Defendant Ali and the Head of U.S. Commercial & Government Affairs applied inappropriate pressure to meet sales targets, Defendant Ali withheld relevant information, from the Board, and that the conduct was inappropriate and improper in violation of the Company's Code of Conduct. Defendant Ali resigned in connection with the Audit Committee's investigation, and the Company fired the

Head of U.S. Commercial & Government Affairs. The Form 10-K/A also admitted: "certain of the Company's prior disclosures relating to these sales practices for wholesalers and their effect upon revenues and product demand in its periodic filings were inaccurate or incomplete."

### 3. Organon's False and Misleading Statements About its Ability to Continue its Dividend Payments

77. The Company's spin-off from Merck did not just allow a spotlight on women's health products that was missing. It allowed Merck to offload $9.5 billion in debt to the Company, which the Company was required to pay off. In addition to being a drain on the Company's capital, this debt also meant that Organon could not pay a dividend and acquire new products at the same time that it paid down this debt. Internally, employees described pessimism about Organon's prospects because of the amount of debt the Company held. One former employee stated that senior leaders at Organon told employees that the Company would "get through" its economic difficulties "by being lean, making cuts, working with fewer resources, and paying down debt." This was not the sentiment shared with the public and investors.

78. On November 3, 2022, the Company held a conference call with analysts and investors to discuss financial results for the third quarter of 2022. During that call, Defendant Walsh stated: "Part of the Organon investment thesis for stakeholders is that the standalone business generates significant free cash flow. We

set the dividend at a rate that would imply that we expect Organon to generate north of $1 billion of free cash flow per year, and that basic math still holds."

79. Later during the call, Defendant Walsh stated that the Company's priority was not paying down debt but making dividend payments: "Our capital allocation priorities remain consistent with past communications. Our first priority, of course, is servicing the dividend."

80. Defendant Walsh attended the JP Morgan Healthcare Conference Fireside Chat on January 10, 2023. During the chat, Defendant Walsh stated:

> When we launched, you were launching into a spec pharma space, which is very heterogeneous and there are not a lot of comps out there for Organon . . . . So, the thought was let's put a nice attractive dividend on the company and that'll provide a baseline for the valuation, and that, at the time, the dividend was sized to be low 20s percent of free cash flow before any one time items related to the spin . . . . So that math is still good math.

81. On February 16, 2023, the Company held a conference call with analysts and investors to discuss financial results for the fourth quarter of 2022. During that call, Defendant Walsh noted that Organon's net leverage ratio had increased from 3.6 times to 3.8 times. But Defendant Walsh reassured investors: "[W]e could see leverage tick higher before leveling back down by the end of the year. This doesn't have a significant impact on our capital allocation priorities, given the strong cash flow characteristics of the business." Later, Defendant Walsh

reiterated: "Our capital allocation priorities remain consistent with past communications. We will continue to prioritize servicing the current dividend."

82. On November 2, 2023, the Company held a conference call with analysts and investors to discuss financial results for the third quarter of 2023. During the call, Defendant Walsh stated:

> In terms of capital allocation, we've been, since the spin-off, trying to achieve a balance of capital allocation between investments and growth for the future, and balancing that against the near term and certain benefits of leverage reduction. That equation has been tilted a little bit more, given where interest rates have gone, the near-term benefits of debt reduction look more attractive. So as we've said in the past a few times, it raises the bar on the type of business development and M&A transactions that we would execute. And that's one of the reasons why you've seen, relatively speaking, a lower level of activity in BD in 2023 than you saw in 2022. We continue to believe that the business – the cash flow profile that the business exhibits supports a dividend, certainly at the level that we have. There's no plans to change that in the near term.

83. Defendant Ali attended the JP Morgan Health Conference on January 9, 2024. During the conference, Defendant Ali stated that 2024 would be "a year of growth, stability, potentially focused on delivering, paying the dividend and ultimately gaining more, I think, shareholder and investor confidence." When asked if Defendant Ali was making a "rock solid commitment to the dividend," Defendant Ali's response was: "Yes." In response to a question about capital allocation, Defendant Ali stated: "I do believe that going forward, we're committed to the dividend."

84. Defendant Walsh presented at the same conference. During this presentation, Defendant Walsh stated: "we've always said our number one priority is the dividend now that we have it."

85. On February 15, 2024, the Company held a conference call with analysts and investors to discuss financial results for the fourth quarter of 2023. During that call, Defendant Ali repeated his sentiments from the JP Morgan conference the month prior: "Yes, you heard me at JPM being very declarative that we are very committed to be able to service our dividend." Later, Defendant Ali stated:

> Look, the combined businesses generate what we expect to be close to $1 billion of free cash flow before onetime charges in 2024. This gives us ample financial flexibility to continue to service our dividend, continue to execute on our business development agenda, and to make progress towards achieving a net debt-to-EBITDA ratio of below 4 by the end of this year.

86. The Company held a conference call with analysts and investors on May 2, 2024, to discuss financial results for the first quarter of 2024. In his opening remarks, Defendant Ali stated: "From a capital allocation standpoint, we continue to believe this business can generate $1 billion of free cash flow before one-time costs, and we will be driving towards that number in 2024." Later, Defendant Ali stated: "strong cash flow will provide financial flexibility to comfortably service our dividend, [and] make progress on achieving a leverage ration below 4 times by the end of 2024."

87. On August 6, 2024, the Company held a conference call with analysts and investors to discuss financial results for the second quarter of 2024. During that call, Defendant Ali stated that "strong cash flow will provide financial flexibility to comfortably service our dividend, which is our number one capital allocation priority."

88. When the Company announced its $1.2 billion acquisition of Dermavant on September 18, 2024, the press release assured investors that "the transaction is not expected to result in a revision to Organon's capital allocation priorities."

89. Then on October 31, 2024, the Company held a conference call with analysts and investors to discuss financial results for the third quarter of 2024. In his opening remarks, Defendant Ali stated that the Company was "well on track to deliver [its] commitment of approximately $1 billion of free cash flow" in 2024 and that the "significant free cash flow enables [the Company] to comfortably service the dividend."

90. On February 13, 2025, the Company held a conference call with analysts and investors to discuss financial results for the fourth quarter of 2024. During the call, Defendant Ali reiterated that Organon was "committed to our regular dividend as our number one capital allocation priority." He later stated:

> This includes eclipsing the $1 billion mark for Nexplanon for the calendar year of 2025. We also have a line of sight to delivering more

> than $300 million of revenue from our recent business development transactions, specifically Emgality and the Dermavant acquisition with $150 million of that coming from Vtama.

91. During the same call, Defendant Walsh stated:

> As we think about capital allocation, the priority, as Kevin [Ali] mentioned, is our dividend. And in the past two years, the highest and best use of the remaining cash flow has been opportunistic business development. In 2024, we made upfront and milestone payments totaling about $350 million. In 2025, we expect to pay a little over $200 million in commercial milestones. We've already paid about $130 million between Vtama's AD approval and Emgality commercial milestones. An additional $30 million to $70 million would be due if milestones for Henlius and SJ02 are met.
>
> The achievement of these milestones means that we're realizing value for business development already signed and validates the path to low to mid-single digit revenue growth post-2025 that we've been saying Organon should be able to deliver.

92. These statements were false and misleading because the Company was engaging in inappropriate conduct, channel stuffing, to meet targets and forecasts for sales and revenues. The Company's ability to continue generating the free cash flows necessary for paying down debt and making dividend payments was dependent on the very misconduct that led to Defendant Ali's resignation. Furthermore, the financial information provided to the public and investors before the truth was revealed showed artificially inflated revenues and sales, which was misleading about the Company's true free cash flows during the Relevant Time Period.

## C. The Truth is Revealed

93. The first indication that the statements made during the Relevant Time Period were not truthful came on May 1, 2025. That day, the Company issued a press release announcing financial results for the first quarter of 2025. The press release revealed that the dividend would be reduced from $0.28 per share to $0.02 per share. According to the press release, the Company had "reset [its] capital allocation priorities to accelerate progress towards deleveraging, enabling a path to achieve a net leverage ratio of below 4.0x by year-end." The press release also quoted Defendant Ali stating that the Company's "capital allocation priorit[y]" was now "maintaining lower leverage."

94. Later that day, the Company held a conference call with analysts and investors to discuss the released financial results. During the call, Defendant Walsh stated:

> The biggest issues we face that can improve Organon's valuation in the near term relate to managing our leverage and relate to growth. And we need capital to solve both of those issue[s]. And so, returning capital to shareholders is right now is less of a priority.

95. Later during the call, Defendant Walsh stated that "[t]he biggest issues we face that can improve Organon's valuation in the near term relate to managing our leverage and relate to growth."

96. The next day, the Company filed with the SEC its Form 10-Q for the first quarter of 2025. The Form 10-Q revealed that Xiromed had filed an application

with the FDA for approval of a generic competitor of Nexplanon. In response, certain analysts questioned the viability of Organon retaining market exclusivity for as long as the Defendants had led them to believe. Analysts for Deutsche Bank stated on May 8, 2025 that "heightened concerns around Nexplanon['s] loss of exclusivity" was a risk that "could have an impact on [the Company's] bond prices."

97. The channel stuffing conduct was revealed on October 27, 2025. The Company filed a Form 8-K with the SEC that day to disclose the findings of an investigation by the Audit Committee. According to the Form 8-K:

> On October 27, 2025, the Company issued a press release announcing the results to date of an investigation by the Audit Committee of the Board regarding the Company's wholesaler sales practices. The investigation is substantially complete, although the Company's review of its internal control over financial reporting is ongoing, as discussed below. Based on the investigation findings to date, as further described below, the Company has determined that there will be no restatement or revision to any of its previously issued financial statements.
>
> There has been no finding that the Company's Chief Financial Officer was aware of the improper wholesaler sales practices.
>
> *Audit Committee Investigation*
>
> After concerns regarding the Company's wholesaler sales practices for Nexplanon® were brought to the Board's attention, the Audit Committee oversaw an independent, internal investigation into these sales practices.
>
> The Audit Committee's investigation has focused on the Company's sales of Nexplanon to wholesalers. The investigation has found that the Company asked certain wholesalers in the United States to purchase greater quantities of Nexplanon at the end of the fourth quarter of 2022, the third and fourth quarters of 2024 and the first, second and third quarters of 2025 (collectively, the "Relevant Periods") than they

otherwise would have purchased based on wholesaler demand. In certain instances, the Company waived inventory management fee performance metrics associated with caps on days of inventory in exchange for such wholesalers accepting the Nexplanon sales, enabling the wholesalers to receive incentive fees from the Company that they otherwise would not have received.

Although the incremental amount of Nexplanon sales that occurred during the Relevant Periods represented less than 1% of the Company's consolidated revenue for the year ended December 31, 2022 or December 31, 2024 as applicable (and less than 2% of the Company's consolidated revenue for the relevant quarterly periods), based on the results to date of the investigation, the Company has determined that without these sales practices, the Company's consolidated revenue for certain of those periods would have fallen short of the Company's guidance and/or certain external revenue expectations. Based on the results to date of the Audit Committee's investigation, the Board determined that these wholesaler sales practices were improper, and that certain of the Company's prior statements were inaccurate or incomplete.

*Ongoing Review of Internal Control Over Financial Reporting*

As a result of the Audit Committee's findings to date and the existence of one or more material weaknesses as of December 31, 2024, the Company has concluded that management's assessment of its internal control over financial reporting that was included in Item 9A of the Company's Annual Report on Form 10-K for the year ended December 31, 2024, filed with the SEC on February 28, 2025 (the "2024 Form 10-K"), should no longer be relied upon. The Audit Committee has discussed the matters disclosed in this filing with PricewaterhouseCoopers LLP. For the reasons described above, PricewaterhouseCoopers LLP's opinion dated February 28, 2025 in the 2024 Form 10-K, relating to the effectiveness of the Company's internal control over financial reporting as of December 31, 2024, should no longer be relied upon.

The Company expects to file an amendment to the 2024 Form 10-K (the "Form 10-K/A") and Quarterly Reports on Form 10-Q for the quarters ended March 31, 2025 and June 30, 2025 (each, a "Form 10-Q/A"). The Company expects that the Form 10-K/A and each Form 10-

> Q/A would correct management's previous determinations that the Company's internal control over financial reporting was effective as of the period covered by the report, among other items that may be included therein. In the Form 10-K/A, the Company expects to report on any material weaknesses as of December 31, 2024, as well as any related remediation efforts and corrective disclosures. The Company further expects the Form 10-K/A would amend and restate the report of PricewaterhouseCoopers LLP to reflect that the Company did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2024.
>
> The Company currently intends to timely file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2025 by the deadline imposed by the rules of the SEC.

98. The Company expanded on the Audit Committee's investigation in the Amended Form 10-K filed with the SEC on November 10, 2025. As stated in the Form 10-K/A:

> *Overview of Audit Committee Investigation and Findings*
>
> As disclosed in the Form 8-K, after concerns regarding the Company's sales practices for wholesalers for Nexplanon were brought to the Board's attention, the Audit Committee oversaw an independent, internal investigation into these sales practices. The Audit Committee's investigation focused on the Company's sales of Nexplanon to wholesalers. The investigation found that the Company asked two wholesalers in the United States to purchase greater quantities of Nexplanon at the end of the fourth quarter of 2022, the third and fourth quarters of 2024 and the first, second and third quarters of 2025 (collectively, the "Relevant Periods") than they otherwise would have purchased based on wholesaler demand. In certain instances, the Company waived inventory management fee performance metrics associated with caps on days of inventory to allow wholesalers to be paid the inventory management fees they would have earned but for the Company's ask to purchase additional inventory. As a result of these purchases, the United States wholesalers significantly decreased or even halted their purchases of Nexplanon during the early weeks of the following quarters until their days of inventory on hand were reduced

to levels within the contractual range. Although the incremental amount of Nexplanon sales that occurred during the Relevant Periods represented less than 1% of the Company's consolidated revenue for the year ended December 31, 2022 or December 31, 2024 as applicable (and less than 2% of the Company's consolidated revenue for the relevant quarterly periods), based on the results of the investigation, the Company has determined that without these sales practices, the Company's consolidated revenue for the fiscal year ended December 31, 2024 reported in the Original Form 10-K (and certain of the other Relevant Periods) would have fallen short of the Company's guidance range and/or certain external expectations. The Audit Committee investigation did not find that the use of these sales practices for wholesalers extended to sales other than sales of Nexplanon in the United States during the Relevant Periods, or that these sales practices for wholesalers were otherwise used for any other Company products.

In connection with the investigation, the Audit Committee found that (i) the Company's former Chief Executive Officer and leader of the Company's U.S. commercial organization applied inappropriate pressure to achieve sales targets, which resulted in two United States wholesalers being asked to purchase inventory in excess of current customer demand for Nexplanon, (ii) the Company's processes with respect to reporting and documenting the sales practices for wholesalers during the Relevant Periods, including with respect to inventory management fee performance metric waivers, were not followed, (iii) the former Chief Executive Officer did not reasonably ensure that relevant information was appropriately communicated; rather, relevant information was withheld from the Company's independent directors, the Audit Committee, and the independent registered public accounting firm, and (iv) the former Chief Executive Officer and leader of the Company's U.S. commercial organization engaged in inappropriate business conduct that violated the Company's Code of Conduct. There were no investigative findings that other members of the Company's executive leadership team, including the Company's Chief Financial Officer, or any member of the Company's accounting and financial reporting group involved in the preparation of the Company's financial statements, were aware that these sales practices resulted in the United States wholesalers being asked to purchase inventory that exceeded their demand or contractual limits, or that waivers were given so that

the United States wholesalers would continue to receive inventory management fees. The Audit Committee's investigation is complete.

Based on the results of the Audit Committee's investigation, the Company determined that these sales practices for wholesalers involving Nexplanon in the United States during the Relevant Periods were improper, and that certain of the Company's prior disclosures relating to these sales practices for wholesalers and their effect upon revenues and product demand in its periodic filings were inaccurate or incomplete, including certain disclosures, as listed above, that are being amended by this Amendment.

*Company Determinations Following the Audit Committee Findings*

Additionally, as a result of the investigation and the Audit Committee findings, Company management, in consultation with the Audit Committee, has re-assessed the effectiveness of the Company's disclosure controls and procedures and its internal control over financial reporting as of December 31, 2024, as reported in the Original Form 10-K. As a result, the Company has concluded that there were material weaknesses in the Company's internal control over financial reporting as of December 31, 2024 and that management's assessment of its disclosure controls and procedures and its internal control over financial reporting as of December 31, 2024 that were included in Item 9A of the Original Form 10-K should no longer be relied upon, as a result of the material weaknesses described herein. A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

The Company has determined that there will be no restatement or revision to its previously-issued financial statements, including those filed with the Original Form 10-K.

*Change in Management*

In connection with the Audit Committee investigation, on October 26, 2025, (i) Kevin Ali resigned as Chief Executive Officer of the Company and as a member of the Company's Board of Directors, (ii) Joseph

> Morrissey, the then-current Executive Vice President and Head of Manufacturing & Supply of the Company, was appointed Interim Chief Executive Officer (and principal executive officer) of the Company, (iii) Carrie S. Cox, Chair of the Board, was appointed Executive Chair for an interim period, and (iv) Robert Essner, a member of the Board, was appointed to the position of Lead Independent Director. Additionally and in connection with the Audit Committee investigation, on October 26, 2025, the Company terminated the employment of its Head of U.S. Commercial & Government Affairs.

99. In the section of the Form 10-K/A concerning the Company's internal controls, the Form 10-K/A stated:

> After concerns regarding the Company's sales practices for wholesalers for Nexplanon were brought to the Board's attention, the Audit Committee oversaw an independent, internal investigation into these sales practices. The Audit Committee's investigation focused on the Company's sales of Nexplanon to wholesalers. The investigation found that the Company asked two wholesalers in the United States to purchase greater quantities of Nexplanon during the Relevant Periods than they otherwise would have purchased based on wholesaler demand. In certain instances, the Company waived inventory management fee performance metrics associated with caps on days of inventory to allow wholesalers to be paid the inventory management fees they would have earned but for the Company's ask to purchase additional inventory. As a result of these purchases, the United States wholesalers significantly decreased or even halted their purchases of Nexplanon during the early weeks of the following quarters until their days of inventory on hand were reduced to levels within the contractual range. Although the incremental amount of Nexplanon sales that occurred during the Relevant Periods represented less than 1% of the Company's consolidated revenue for the year ended December 31, 2022 or December 31, 2024, as applicable (and less than 2% of the Company's consolidated revenue for the relevant quarterly periods), based on the results of the investigation, the Company has determined that without these sales practices, the Company's consolidated revenue for the fiscal year ended December 31, 2024 reported in the Original Form 10-K (and certain of the other Relevant Periods) would have

fallen short of the Company's guidance range and/or certain external revenue expectations.

Based on the results of the Audit Committee's investigation as further set forth in the "Explanatory Note", the Company determined that these sales practices for wholesalers involving Nexplanon in the United States during the Relevant Periods were improper, and that certain of the Company's prior disclosures relating to these sales practices for wholesalers and their effect upon revenues and product demand in its periodic filings were inaccurate or incomplete, including certain disclosures in the Original Form 10-K that are being amended by this Amendment. As also discussed in the "Explanatory Note", the Company identified material weaknesses in its internal control over financial reporting, which are described below.

**Evaluation of Disclosure Controls and Procedures (Restated and Amended)**

We have established disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) promulgated under the Exchange Act) to provide reasonable assurance that information required to be disclosed in the reports we file or submit under the Exchange Act is accumulated and communicated to our management, including our Interim Chief Executive Officer ("CEO") (our principal executive officer) and Chief Financial Officer ("CFO") (our principal financial officer), as appropriate to allow timely decisions regarding required disclosure, and ensure that information required to be disclosed in the reports we file or submit is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms.

Our management, with the participation of our Interim CEO and CFO, re-evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2024 in connection with the filing of this Amendment. At the time that the Original 10-K was filed on February 28, 2025, our former CEO and CFO had concluded that our disclosure controls and procedures were effective as of December 31, 2024. Based on this subsequent evaluation, the Company's Interim CEO and CFO have concluded that our disclosure controls and procedures were not effective as of December 31, 2024, due to the material weaknesses in internal control over financial reporting described below.

Notwithstanding the material weaknesses described below, management has concluded that its consolidated financial statements included in the Original Form 10-K, which are also included in their entirety in this Amendment (without restatement or revision of such previously issued consolidated financial statements), continue to fairly present, in all material respects, our financial position and results as of December 31, 2024 and 2023, and as of and for each of the years in the three-year period ended December 31, 2024.

**Management's Report on Internal Control Over Financial Reporting (Restated and Amended)**

Management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles in the United States of America. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis.

Management conducted an evaluation of the effectiveness of internal control over financial reporting as of December 31, 2024 based on the framework in Internal Control — Integrated Framework issued in 2013 by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) ("COSO Framework").

Based on this evaluation, we identified the following material weaknesses in the Company's internal control over financial reporting:

- The Company failed to set an appropriate tone at the top. Specifically, our former CEO and leader of the Company's U.S.

commercial organization applied inappropriate pressure to achieve sales targets through sales of Nexplanon to two United States wholesalers above demand and engaged in inappropriate business conduct that violated the Company's Code of Conduct.

- The material weakness with respect to our tone at the top contributed to an additional material weakness of not maintaining effective controls related to information and communication. The Company did not design and maintain effective controls related to the information and communication component of the COSO Framework. Specifically, the former CEO and certain senior members of the Company's U.S. commercial organization did not ensure appropriate communication with, or provide complete information to, the Company's Disclosure Committee and the financial reporting group to evaluate disclosures and financial reporting conclusions related to sales practices for wholesalers.

These material weaknesses did not result in misstatements of our previously reported historical consolidated financial statements, including those filed with the Original Form 10-K. Each of these material weaknesses could result in a misstatement of substantially all account balances or disclosures that would result in a material misstatement to our annual or interim consolidated financial statements that would not be prevented or detected.

In Management's Report on Internal Control Over Financial Reporting included in our Original 10-K for the year ended December 31, 2024, our management, including our former CEO and our CFO, concluded that our internal control over financial reporting was effective as of December 31, 2024. Management subsequently concluded that the material weaknesses described above existed as of December 31, 2024. As a result, management has concluded that the Company did not maintain effective internal control over financial reporting as of December 31, 2024 based on the criteria in the COSO Framework. Accordingly, management has restated its report on internal control over financial reporting.

The effectiveness of the Company's internal control over financial reporting as of December 31, 2024 has been audited by PricewaterhouseCoopers LLP, an independent registered public

accounting firm, as stated in their report which appears under Item 8 of this Amendment.

**Remediation Plan and Activities**

To address the material weaknesses in internal control over financial reporting, the Company, with the oversight of its Audit Committee, has developed a remediation plan, which is described below. We are in the process of implementing measures designed to improve our internal control over financial reporting and remediate the control deficiencies that led to the material weaknesses described above. Actions taken to date include:

- The appointment of a new Interim CEO, the termination and appointment of a new Head of U.S. Commercial & Government Affairs, the appointment of an Executive Chair and the appointment of a Lead Independent Director.

In addition to the remedial actions taken to date, the Company is taking, or plans to take, the following actions, among others, to remediate the material weaknesses identified herein:

- Enhance the Company's Code of Conduct to clarify responsibilities related to the Company's financial reporting and disclosures, including awareness of the options to raise concerns or questions to management, human resources, compliance, legal, the technical accounting department and/or through the SpeakUp Tool, which is available globally as an alternate, confidential channel for raising concerns;

- Enhance compliance training and communication on the Company's Code of Conduct regarding ethical tone and corporate culture and enhance training for commercial and finance personnel regarding appropriate business practices;

- Enhance the Company's Annual Ethics and Policy Certifications;

- Implement additional representations within the Company's Quarterly Financial Certification Questionnaire relating to the disclosures of misleading business practices;

- Enhance existing Disclosure Committee responsibilities to include among other requirements, additional questions and more information regarding the representations being made, and provide incremental training on these responsibilities;
- Implement additional and enhance existing sub-certifications and internal management representation letters, including providing training on the purpose of the sub-certification and the process for evaluating the representations;
- Enhance controls and implement written policies and procedures to provide governance, oversight and guidelines for timely communication of management fee arrangements with wholesalers; and
- Evaluate and enhance internal controls related to sales monitoring.

Management continues to evaluate the effectiveness of these remedial measures and expects to continue implementing improvements to the Company's internal control over financial reporting. The process of designing and maintaining effective internal control over financial reporting is a continuous effort that requires management to anticipate and react to changes in our business, economic, and regulatory environments and to expend significant resources. As we continue to evaluate our internal control over financial reporting, we may take additional actions to remediate the material weaknesses or modify the remediation actions described above.

**D. The Merger**

100. On April 26, 2026, the Company announced that it was being acquired by Sun Pharmaceutical Industries Limited, a specialty generics company. Organon stockholders will receive $14.00 per share in cash, for an enterprise value of $11.75 billion.

101. The Company filed with the SEC a Schedule 14A Definitive Proxy Statement on June 17, 2026 (the "Merger Proxy"). According to the Merger Proxy, stockholders will be asked to vote on the transaction on July 23, 2026, with the transaction expected to close in early 2027.

102. The Merger Proxy reveals that it was not until after the Company revealed the channel stuffing conduct and the resignation of Defendant Ali that it began considering a potential strategic transaction. At a meeting on December 2, 2025, the Board discussed potential strategic alternatives, including a sale of the Company, a break-up of Organon into two separate segments, or continuing the standalone plan. After that discussion, the Board decided to form the Strategic Alternatives Committee to oversee the process evaluating the strategic alternatives. The members of the Strategic Alternatives Committee included Defendant Cox, who was Executive Chair and not independent. Defendant Cox was meeting with representatives of the companies pursuing a transaction and essentially leading the process.

103. Given the misconduct uncovered and revealed in October 2025, the admitted failure of internal controls over financial reporting, the SEC's investigation into the misconduct, the lack of any interest in a potential sale of the Company until late 2025, the timing of the sale of the Company is suspicious. Furthermore, Organon touts itself as focused on women's health, which is not a focus of its buyer.

**E. The Board was Complicit in the Misconduct**

104. The Board allowed the misconduct to occur and contributed to the false and misleading statements made during the Relevant Time Period. For example, it is the Board that decides whether the Company will pay a dividend, and the amount of the dividend. There would be no dividend payments without the Board's express approval. The continued payment of dividends throughout the Relevant Time Period only occurred because the Board allowed it.

105. In addition, the Board received updates on the Company's financial results and communications with investors. When the Board met on December 3, 2024, they were provided [redacted] OGN-220-00000002-3. At the same [redacted] OGN-220-00000003. [redacted] OGN-220-00000004 [redacted] OGN-220-00000011.

106. The Board received similar updates when it met on February 4, 2025. During that meeting, [redacted]

[redacted] OGN-220-00000028. According to the minutes for that meeting:

[redacted]

OGN-220-00000029 [redacted] OGN-220-00000030.

107. Also at the February 4, 2025, Board meeting, the Board was provided [redacted] OGN-220-00000030. According to the minutes for that meeting [redacted] OGN-220-00000030.

108. When the Board met on April 15, 2025 [redacted] OGN-220-00000052. According to the minutes for the meeting [redacted]

[redacted] OGN-220-00000053.

109. The Board was also informed [redacted] According to the minutes for the December 3, 2024 Board meeting: [redacted] OGN-220-00000006.

110. The Board received information [redacted] at the February 4, 2025, meeting [redacted] OGN-220-00000032. Also, according to the minutes for the meeting [redacted] OGN-220-00000033.

111. The Board received an in-depth update [redacted] at its April 15, 2025, meeting. According to the minutes for that meeting:

[redacted]



Redacted

[redacted]

[redacted]

[redacted]

[redacted]

OGN-220-00000056-7.

112. The Board also spoke specifically about [redacted] During the Board meeting on April 15, 2025 [redacted]

[redacted] OGN-220-00000051-2.

113. The Board met again on April 29, 2025 to discuss [redacted] As written in the minutes for the meeting:

[redacted]

[redacted]

[redacted]

[redacted]



Redacted

[redacted] OGN-220-00000136-8.

114. The Board later met in an executive session [redacted] OGN-220-00000138.

115. The minutes from the Board meetings make clear that the Board was informed and actively involved in the Company [redacted] As informed and involved as the Board was, the existence of the false and misleading statements and misconduct detailed above show that the Board was complicit in allowing the misconduct to occur.

**F. Defendants' Misconduct Has and Continues to Harm the Company**

116. As a direct and proximate result of the Defendants' conduct, the Company has been harmed and will continue to be. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the securities class action *In re Organon & Co. Securities Litigation*, Case No. 2:25-cv-005322-JXN-CF (D.N.J.), as well as costs to be incurred in remediating the deficiencies in the Company's internal controls.

117. The Company is also subject to an SEC investigation into the misconduct detailed herein. In its Form 10-K for fiscal year 2025 with the SEC on February 24, 2026, the Company states:

> On October 26, 2025, we made a voluntary self-disclosure to the SEC to advise it of the Audit Committee's investigation, and the SEC subsequently opened an investigation into these matters. See Note 18 "Contingencies— Governmental Proceedings" to the Consolidated Financial Statements in this 2025 Form 10-K for additional information.

118. In addition, Organon's reputation and goodwill have also been damaged by the Defendants' misconduct.

**G. Organon Issues False and Misleading Proxy Statements**

119. In addition to the false and misleading statements discussed above, the Director Defendants also caused the Company to issue false and misleading proxy statements during the Relevant Period, including the Schedule 14A Proxy Statements issued on April 27, 2023 (the "2023 Proxy"), April 25, 2024 (the "2024 Proxy"), and April 25, 2025 (the "2025 Proxy" and, together with the 2023 Proxy and 2024 Proxy, the "Proxies") that sought stockholder votes to, among other things, re-elect the Director Defendants to serve on the Board.

120. The Director Defendants drafted, approved, reviewed, and/or signed the Proxies Proxy before they were filed with the SEC and disseminated to Organon's stockholders. The Director Defendants negligently issued materially misleading statements in the Proxies. These allegations are based solely on

negligence; they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Director Defendants and they do not allege or do not sound in fraud. Plaintiffs specifically disclaim any allegations of reliance upon any allegation of, or reference or any allegation of fraud, scienter, or recklessness with regard to the Proxies allegations and related claims.

121. In support of re-electing themselves, the Director Defendants highlighted their supposed oversight of the Company in the Proxies. The 2023 Proxy stated:

> Risk Oversight
>
> The Board's oversight of Organon's risk is an important component of the Board's engagement on strategic planning, and the Board has two primary methods of overseeing risk. The first method is through Organon's Enterprise Risk Management ("ERM") process, which allows for Board oversight of the most significant risks facing Organon. The second method is through the functioning of the three standing committees of the Board — the Talent Committee, the Audit Committee, and the Environmental, Social and Governance Committee ("ESG Committee").
>
> Management has established the ERM process to facilitate a complete company-wide approach to evaluating risk over six distinct but overlapping risk areas:
>
> Responsibility and Reputation > Risks that may impact the well-being of Organon and its employees, customers, patients, communities, or reputation
>
> Strategy > Macro risks that may impact our ability to achieve long-term business objectives
>
> Operations > Risks related to our operations, cybersecurity and climate change that may impact our ability to achieve business objectives

Compliance > Risks related to compliance with laws, regulations, and Organon's values, ethics, and policies

Reporting > Risks to maintaining accurate financial statements and timely, complete public company financial reporting

Safety > Risks to employee, patient, customer, or community health and safety

The goal of the ERM process is to provide an ongoing effort, implemented across Organon and aligned to its values and ethics, to identify and assess risk and to monitor risk and agreed-upon mitigating actions. If the ERM process identifies a material risk, it is elevated to the CEO, the Executive Leadership Team and the Board for review. The Audit Committee periodically reviews the ERM process to ensure it is robust and functioning effectively.

Each Board committee oversees specific areas of risk relevant to the committee through direct interactions with the CEO, the Executive Leadership Team, the heads of business franchises, and/or compliance and corporate functions. A committee may address risks directly with management or, where appropriate, may elevate a risk for consideration by the Board or another Board committee. The following are examples of Board committees' responsibilities in risk oversight:

- The Audit Committee has primary responsibility for overseeing Organon's risk-management program relating to cybersecurity, although the Board participates in periodic reviews and discussion dedicated to cyber risks, threats, and protections, as discussed under Board Oversight of Information Security, including Cybersecurity and Data Privacy. The Audit Committee also oversees risk relating to finance, business integrity, compliance, and internal controls, disclosure controls, and related financial reporting through its interactions with the Chief Financial Officer, the General Counsel, the Chief Ethics and Compliance Officer, the Controller, and the Head of Internal Audit.

- The Talent Committee has risk oversight responsibilities over our policies and practices with respect to our executive compensation program. The Talent Committee also has oversight of Organon's

> programs, policies, and practices related to its management of human capital resources, including talent and diversity.
>
> - The ESG Committee oversees Organon's corporate governance, including the practices, policies, and procedures of the Board and its committees, considers the size, structure, and needs of the Board, reviews possible candidates for the Board, recommends director nominees to the Board for approval, and plays a role in ESG-related risk and compliance oversight, including in the areas of environmental health and safety and manufacturing quality systems.
>
> The ERM process and Board committee approach to risk management leverages the Board's leadership structure to ensure the Board oversees risk on both an enterprise-wide approach and through specific areas of competency.

The 2024 Proxy and 2025 Proxy contained substantially similar statements.

122. The Proxies thus assured stockholders that the Director Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, the Director Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose or prevent the Defendants from causing the Company to make materially false and misleading statements concerning the Company's Nexplanon sales practices, the risk of generic competition for Nexplanon, and the Company's ability to make dividend payments.

123. As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to re-elect the Director Defendants to the Board.

**H. The Board Breached its Fiduciary Duties**

124. As officers and/or directors of Organon, the Defendants owed Organon fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Organon in a fair, just, honest and equitable manner. The conduct of the Director Defendants involves a knowing or reckless violation of their obligations as directors and officers of Organon, the absence of good faith on their part, and a reckless disregard for their duties to the Company that Director Defendants were aware or should have been aware posed a risk of serious injury to the Company.

125. Defendants, because of their positions of control and authority as directors and/or officers of Organon, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly traded company, the Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding Organon's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

126. To discharge their duties, the officers and directors of Organon were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors and Organon were required to, among other things:

(a) Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the Company's stockholders;

(b) Conduct the affairs of the Company in a lawful, efficient, business-like manner to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(d) Oversee public statements made by the Company's officers and employees as to the financial condition of the Company at any given time, including ensuring that any statements about the Company's financial results and prospects are accurate, and ensuring that the Company maintained an adequate system of financial controls such that

the Company's financial reporting would be true and accurate at all times;

(e) Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(f) Maintain and implement an adequate and functioning system of internal controls to ensure that the Company complied with all applicable laws, rules, and regulations; and

(g) Ensure that the Company is operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

127. The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its stockholders, which the Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

128. The Board's Audit Committee is tasked with overseeing Organon's financial reporting system and assisting the Board with its oversight of the adequacy and effectiveness of Organon's internal controls over financial reporting and its disclosure controls and procedures. Specifically, according to the Audit Committee's charter, the Audit Committee's responsibilities include:

- Meet to review and discuss with management and the Independent Auditor the annual audited and quarterly unaudited financial statements of the Company (including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations") and the Independent Auditor's reports related to the financial statements.

- Review and discuss (at least annually) reports from the Independent Auditor and management regarding:

  (1) the adequacy and effectiveness of the Company's internal controls, including any significant deficiencies in internal controls;

  (2) the adequacy and effectiveness of the Company's disclosure controls and procedures; and

  (3) management's evaluation of the adequacy of internal controls, including the attestation by the Independent Auditor.

- Review and discuss earnings press releases, and corporate practices with respect to earnings press releases and financial information and earnings guidance provided to analysts and ratings agencies, including any non-GAAP or pro-forma information.

- Monitor the Company's compliance program with respect to legal and regulatory requirements (other than requirements that

> are being monitored by other committees), the Company's code(s) of conduct and the Company's policies on ethical business practices and report on the same to the Board. Receive reports from the chief compliance officer on a regular basis, who shall have the authority to communicate directly to the Audit Committee, promptly, about actual and alleged violations of law or the Company's code(s) of conduct, including any matters involving criminal or potential criminal conduct. Review and approve any waivers of the Company's code(s) of conduct for directors and executive officers.

129. In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants Ezekowitz, Leone, Patton, and Sharp conducted little, if any, oversight of the Company's internal controls over financial reporting, resulting in materially false and misleading statements regarding the Company's business and consciously disregarded their duties to monitor such controls. The Audit Committee's complete failure to perform their duties in good faith resulted in misrepresentations to the public and the Company's stockholders.

130. In addition, as officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act, the Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Defendants breached their fiduciary duties by

knowingly or recklessly causing the Company to make false and misleading statements of material fact about the Company's maintaining adequate internal controls and compliance with applicable rules and regulations.

131. The Defendants' flagrant violations of their fiduciary duties and unwillingness to heed the requirements of their Audit Committee Charter have inflicted, and will continue to inflict, significant harm on Organon.

## I. Plaintiffs Diligently Pursued a Section 220 Investigation

132. The disturbing pattern of corporate conduct outlined above prompted Plaintiffs to seek inspection of Organon's books and records pursuant to 8 *Del. C.* § 220 (the "220 Demand"). Plaintiffs demanded to inspect the following of Organon's books and records:

1. All minutes, agendas, presentations, exhibits, reports, summaries, memoranda, outlines, scripts, talking points, and notes concerning meetings, resolutions or acts by written consent of the Board or any committee or subcommittee thereof between October 31, 2024 to April 30, 2025, that contained any discussion of:

    a. the Company's capital allocation strategy;

    b. the Company's debt reduction strategy following the Company's acquisition of Dermavant; and

    c. the decision to reduce the Company's dividend, as announced on May 1, 2025.

2. All documents pertaining to the independence of the members of the Board, including but not limited to annual questionnaires for

members of the Board relating to director independence, from January 1, 2024, to the date of this Demand.

133. After meeting and conferring, Plaintiffs and Organon negotiated a confidentiality agreement that was executed on February 19, 2026.

134. The Company produced documents on February 24, 2026. In total, Organon produced 139 pages of documents in response to the 220 Demand.

## DERIVATIVE ALLEGATIONS

135. Plaintiffs bring this action derivatively in the right and for the benefit of Organon to redress injuries suffered by Organon as a direct result of the Director Defendants' breaches of fiduciary duty. Organon is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

136. Plaintiffs will adequately and fairly represent the interests of Organon in enforcing and prosecuting the Company's rights.

137. Plaintiffs were stockholders of Organon at the time of the wrongdoing complained of, have continuously been stockholders since that time, and are currently Organon stockholders.

## DEMAND FUTILITY ALLEGATIONS

138. Plaintiff repeats, re-alleges, and incorporates by reference each and every allegation set forth as though fully set forth herein.

139. The Organon Board currently has ten members: Defendants Cox, Essner, Ezekowitz, Gayle, Lazarus, Leone, Ozuah, Patton, Sequeira, and Sharp.

140. Plaintiffs have not made any demand on Organon's current Board to institute this action against the Director Defendants, as any pre-suit demand would be excused. The Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

141. The Director Defendants had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. In addition, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.

142. The Director Defendants' making or authorization of the false and misleading statements discussed above caused the Company's stock to trade at artificially inflated prices and misrepresented the financial health of Organon. The failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and failure to take necessary

and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required due diligence, constitute breaches of fiduciary duties that have resulted in the Director Defendants facing a substantial likelihood of liability. The Director Defendants could not fairly and fully prosecute this action or any other action concerning the misconduct described above.

**A. Demand is Excused as to Defendant Cox**

143. Defendant Cox is the Executive Chair of Organon. As Executive Chair, Defendant Cox has additional responsibilities to assist the interim CEO, Joseph Morrissey. Defendant Cox receives a salary of $100,000 per month as Executive Chair and received $460,645 in compensation as a director in 2025, making her dependent on Organon for his income. In addition, Organon stated in the Schedule 14A Proxy Statement filed with the SEC on April 24, 2026 (the "2026 Proxy") that Defendant Cox is not independent pursuant to NYSE Listing Standards.

144. Defendant Cox served as a director of the Company during the Relevant Time Period. As a director, Defendant Cox had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Cox was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

145. Defendant Cox failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Organon's controls, Defendant Cox failed to protect corporate assets.

146. Defendant Cox was an active participant in the misconduct described above. Defendant Cox signed the 2025 Form 10-K filed by the Company during the Relevant Time Period, and which was amended on November 10, 2025. Defendant Cox therefore faces a substantial likelihood of liability.

**B. Demand is Excused as to Defendant Essner**

147. Defendant Essner served as a director of the Company during the Relevant Time Period. As a director, Defendant Essner had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Essner was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

148. Defendant Essner failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Organon's controls, Defendant Essner failed to protect corporate assets.

149. According to the 2026 Proxy Statement, Defendant Essner received $384,140 in compensation in connection with his role as a Company director. Accordingly, Defendant Essner cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

150. Defendant Essner was an active participant in the misconduct described above. Defendant Essner signed the 2025 10-K, which was amended on November 10, 2025. Defendant Essner therefore faces a substantial likelihood of liability.

151. Defendant Essner knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Essner breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Essner faces a substantial likelihood of liability for these breaches, making any demand on Defendant Essner futile.

**C. Demand is Excused as to Defendant Ezekowitz**

152. Defendant Ezekowitz served as a director of the Company during the Relevant Time Period. As a director, Defendant Ezekowitz had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Ezekowitz was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

153. Defendant Ezekowitz failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Organon's controls, Defendant Ezekowitz failed to protect corporate assets.

154. According to the 2026 Proxy Statement, Defendant Ezekowitz received $370,000 in compensation in connection with his role as a Company director. Accordingly, Defendant Ezekowitz cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

155. Defendant Ezekowitz was an active participant in the misconduct described above. Defendant Ezekowitz signed the 2025 10-K, which was amended on November 10, 2025. Defendant Ezekowitz therefore faces a substantial likelihood of liability.

156. Defendant Ezekowitz served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for reviewing the Company's financial statements and monitoring the adequacy and effectiveness of the Company's internal controls over financial reporting. The Audit Committee was thus responsible for reviewing and approving Organon's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Ezekowitz was thus responsible for knowingly or recklessly allowing the improper statements related to the Company's

Nexplanon sales practices, the risk of generic competition for Nexplanon, and the Company's ability to make dividend payments.

157. Defendant Ezekowitz knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Ezekowitz breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Ezekowitz faces a substantial likelihood of liability for these breaches, making any demand on Defendant Ezekowitz futile.

**D. Demand is Excused as to Defendant Gayle**

158. Defendant Gayle served as a director of the Company during the Relevant Time Period. As a director, Defendant Gayle had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Gayle was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

159. Defendant Gayle failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Organon's controls, Defendant Gayle failed to protect corporate assets.

160. According to the 2026 Proxy Statement, Defendant Gayle received $363,656 in compensation in connection with her role as a Company director. Defendant Gayle is not otherwise employed. Accordingly, Defendant Gayle cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

161. Defendant Gayle was an active participant in the misconduct described above. Defendant Gayle signed the 2025 10-K, which was amended on November 10, 2025. Defendant Gayle therefore faces a substantial likelihood of liability.

162. Defendant Gayle knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Gayle breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Gayle faces a substantial likelihood of liability for these breaches, making any demand on Defendant Gayle futile.

**E. Demand is Excused as to Defendant Lazarus**

163. Defendant Lazarus served as a director of the Company during the Relevant Time Period. As a director, Defendant Lazarus had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Lazarus was also required to act in

good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

164. Defendant Lazarus failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Organon's controls, Defendant Lazarus failed to protect corporate assets.

165. According to the 2026 Proxy Statement, Defendant Lazarus received $360,000 in compensation in connection with her role as a Company director. Defendant Lazarus is not otherwise employed. Accordingly, Defendant Lazarus cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

166. Defendant Lazarus was an active participant in the misconduct described above. Defendant Lazarus signed the 2025 10-K, which was amended on November 10, 2025. Defendant Lazarus therefore faces a substantial likelihood of liability.

167. Defendant Lazarus knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Lazarus breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Lazarus faces a substantial likelihood of liability for these breaches, making any demand on Defendant Lazarus futile.

**F. Demand is Excused as to Defendant Leone**

168. Defendant Leone served as a director of the Company during the Relevant Time Period. As a director, Defendant Leone had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Leone was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

169. Defendant Leone failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Organon's controls, Defendant Leone failed to protect corporate assets.

170. According to the 2026 Proxy Statement, Defendant Leone received $370,000 in compensation in connection with her role as a Company director. Defendant Leone is not otherwise employed. Accordingly, Defendant Leone cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

171. Defendant Leone was an active participant in the misconduct described above. Defendant Leone signed the 2025 10-K, which was amended on November 10, 2025. Defendant Leone therefore faces a substantial likelihood of liability.

172. Defendant Leone served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for reviewing the Company's financial statements and monitoring the adequacy and effectiveness of the internal controls over financial reporting. The Audit Committee was thus responsible for reviewing and approving Organon's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Leone was thus responsible for knowingly or recklessly allowing the improper statements related to the Company's Nexplanon sales practices, the risk of generic competition for Nexplanon, and the Company's ability to make dividend payments.

173. Defendant Leone knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Leone breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Leone faces a substantial likelihood of liability for these breaches, making any demand on Defendant Leone futile.

**G. Demand is Excused as to Defendant Ozuah**

174. Defendant Ozuah served as a director of the Company during the Relevant Time Period. As a director, Defendant Ozuah had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Ozuah was also required to act in

good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

175. Defendant Ozuah failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Organon's controls, Defendant Ozuah failed to protect corporate assets.

176. According to the 2026 Proxy Statement, Defendant Ozuah received $380,000 in compensation in connection with his role as a Company director. Accordingly, Defendant Ozuah cannot reasonably and objectively consider a demand to sue the Board that controls his continued compensation.

177. Defendant Ozuah was an active participant in the misconduct described above. Defendant Ozuah signed the 2025 10-K, which was amended on November 10, 2025. Defendant Ozuah therefore faces a substantial likelihood of liability.

178. Defendant Ozuah knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Ozuah breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Ozuah faces a substantial likelihood of liability for these breaches, making any demand on Defendant Ozuah futile.

### H. Demand is Excused as to Defendant Patton

179. Defendant Patton served as a director of the Company during the Relevant Time Period. As a director, Defendant Patton had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Patton was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

180. Defendant Patton failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Organon's controls, Defendant Patton failed to protect corporate assets.

181. According to the 2026 Proxy Statement, Defendant Patton received $370,000 in compensation in connection with her role as a Company director. Accordingly, Defendant Patton cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

182. Defendant Patton was an active participant in the misconduct described above. Defendant Patton signed the 2025 10-K, which was amended on November 10, 2025. Defendant Patton therefore faces a substantial likelihood of liability.

183. Defendant Patton served on the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for reviewing the Company's financial statements as well as monitoring the adequacy and effectiveness of the internal controls over financial reporting. The Audit Committee was thus responsible for reviewing and approving Organon's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Patton was thus responsible for knowingly or recklessly allowing the improper statements related to the Company's Nexplanon sales practices, the risk of generic competition for Nexplanon, and the Company's ability to make dividend payments.

184. Defendant Patton knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Patton breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Patton faces a substantial likelihood of liability for these breaches, making any demand on Defendant Patton futile.

**I. Demand is Excused as to Defendant Sequeira**

185. Defendant Sequeira served as a director of the Company during the Relevant Time Period. As a director, Defendant Sequeira had a duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Sequeira was also required to act in

good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

186. Defendant Sequeira failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Organon's controls, Defendant Sequeira failed to protect corporate assets.

187. According to the 2026 Proxy Statement, Defendant Sequeira received $280,000 in compensation in connection with her role as a Company director. Defendant Sequeira is not otherwise employed. Accordingly, Defendant Sequeira cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

188. Defendant Sequeira knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Sequeira breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Sequeira faces a substantial likelihood of liability for these breaches, making any demand on Defendant Sequeira futile.

**J. Demand is Excused as to Defendant Sharp**

189. Defendant Sharp served as a director of the Company during the Relevant Time Period. As a director, Defendant Sharp had a duty to ensure that the Company's SEC filings, press releases, and other public statements and

presentations concerning its business, operations, prospects, internal controls, and financial statements were accurate. Defendant Sharp was also required to act in good faith and with due diligence to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively).

190. Defendant Sharp failed to conduct oversight of the Company's internal controls over financial reporting or the Company's statements to regulators, investors, and the public. By consciously disregarding the duty to monitor Organon's controls, Defendant Sharp failed to protect corporate assets.

191. According to the 2026 Proxy Statement, Defendant Sharp received $385,000 in compensation in connection with her role as a Company director. Defendant Sharp is not otherwise employed. Accordingly, Defendant Sharp cannot reasonably and objectively consider a demand to sue the Board that controls her continued compensation.

192. Defendant Sharp was an active participant in the misconduct described above. Defendant Sharp signed the 2025 10-K, which was amended on November 10, 2025. Defendant Sharp therefore faces a substantial likelihood of liability.

193. Defendant Sharp served as Chair of the Audit Committee during the Relevant Time Period. The Audit Committee is responsible for reviewing the Company's financial statements and monitoring the adequacy and effectiveness of the internal controls over financial reporting. The Audit Committee was thus

responsible for reviewing and approving Organon's Forms 10-Q and 10-K filed during the Relevant Time Period. Defendant Sharp was thus responsible for knowingly or recklessly allowing the improper statements related to the Company's Nexplanon sales practices, the risk of generic competition for Nexplanon, and the Company's ability to make dividend payments.

194. Defendant Sharp knowingly or recklessly disregarded failures in the Company's internal controls. Accordingly, Defendant Sharp breached the fiduciary duty of loyalty and good faith by participating in the misconduct described above. Defendant Sharp faces a substantial likelihood of liability for these breaches, making any demand on Defendant Sharp futile.

195. Based on the facts alleged herein, there is a substantial likelihood that Plaintiffs will be able to prove that these individuals breached their fiduciary duties by condoning the misconduct and failing to take meaningful action to remedy the resultant harm.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of Fiduciary Duty
### (Derivatively Against The Director Defendants)

196. Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

197. Each of the Director Defendants owed and owes Organon the highest obligations of loyalty, good faith, due care, and oversight.

198. Each of the Director Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

199. The Director Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Director Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

200. In addition, the Director Defendants further breached their fiduciary duties owed to Organon by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose that the Company had engaged in improper sales practices, the true risk of generic competition for Nexplanon, and the Company's ability to make dividend payments.

201. The Director Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact, exposing them to personal liability to the Company for breaching their fiduciary duties.

202. The Director Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Director Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Director Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

203. As a direct and proximate result of the breaches of duty alleged herein, Organon has sustained and will sustain significant damages.

204. As a result of the misconduct alleged herein, these Defendants are liable to the Company.

205. Plaintiff, on behalf of Organon, has no adequate remedy at law.

**COUNT II**
**Breach of Fiduciary Duty**
**(Derivatively Against the Officer Defendants)**

206. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

207. The Officer Defendants are executive officers of the Company. As executive officers, the Officer Defendants owed and owe Organon the highest obligations of loyalty, good faith, due care, oversight, and candor.

208. The Officer Defendants breached their fiduciary duties owed to Organon by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact, failing to disclose that the Company had engaged in improper sales practices, the true risk of generic competition for Nexplanon, and the Company's ability to make dividend payments. The Officer Defendants failed to correct and cause the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact.

209. As a direct and proximate result of the breaches of duty alleged herein, Organon has sustained and will sustain significant damages.

210. As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

211. Plaintiffs, on behalf of Organon, have no adequate remedy at law.

**COUNT III**
**Gross Mismanagement**
**(Against All Defendants)**

212. Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

213. By their actions alleged herein, the Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation

214. As a direct and proximate result of the Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages.

215. As a direct and proximate result of the gross mismanagement and breaches of duty alleged herein, Organon has sustained and will sustain significant damages.

216. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

217. Plaintiffs, on behalf of Organon, have no adequate remedy at law.

**COUNT IV**
**Waste of Corporate Assets**
**(Derivatively Against All Defendants)**

218. Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

219. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Time Period. It resulted in continuous, connected, and ongoing harm to the Company.

220. As a result of the misconduct described above, the Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

221. As a direct and proximate result of the waste of corporate assets and breaches of duty alleged herein, Organon has sustained significant damages.

222. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

223. Plaintiffs, on behalf of Organon, have no adequate remedy at law.

## COUNT V
## Unjust Enrichment
## (Derivatively Against the Officer Defendants)

224. Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

225. By their wrongful acts, violations of law, and false or misleading statements or omissions of material fact that they caused to be made, the Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

226. The Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

227. Plaintiffs, on behalf of Organon, seek restitution from the Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation based compensation, obtained by the Defendants due to their wrongful conduct and breach of their fiduciary duties.

## COUNT VI
## Violation of Section 14(a) of the Exchange Act
## (Against The Director Defendants)

228. Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

229. The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. The section 14(a) Exchange Act claims detailed herein do not allege and do not sound in fraud. Plaintiffs specifically disclaim any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

230. The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the Proxies. In the Proxies, the Board solicited stockholder votes to reelect the Director Defendants to the Board.

231. The Proxies, however, misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Organon misled and deceived its stockholders by making materially misleading statements that were

essential links in stockholders following the Company's recommendation and voting to reelect the Director Defendants.

232. Plaintiffs, on behalf of Organon, thereby seek relief for damages inflicted upon the Company based upon the misleading Proxies in connection with the improper reelection of the Director Defendants to the Board.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs demand judgment as follows:

A. Declaring that Plaintiffs may maintain this derivative action on behalf of Organon and that Plaintiffs are proper and adequate representatives of the Company;

B. Against all of the Defendants and in favor of Organon for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C. Granting appropriate equitable relief to remedy the Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D. Awarding Organon restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

E. Awarding Plaintiffs the costs and disbursements of this action,

including reasonable attorneys' and expert fees and expenses; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: September 18, 2026

Respectfully submitted,

**LYNCH CARPENTER, LLP**

*/s/ Gerald D. Wells, III*
Gerald D. Wells, III (SBN 040652001)
1760 Market Street, Suite 600
Philadelphia, PA 19103
Telephone: (267) 609-6910
Fax: (267) 609-6955
Email: jerry@lcllp.com

**ROWLEY LAW PLLC**
Shane T. Rowley (SR-0740)
Danielle Rowland Lindahl
50 Main Street, Suite 1000
White Plains, NY 10606
Tel: (914) 400-1920
Fax: (914) 301-3514
Email: srowley@rowleylawpllc.com
drl@rowleylawpllc.com

***Attorneys for Plaintiffs***

**VERIFICATION**

Benjamin and Margaret Lapin, are the named plaintiffs in the foregoing derivative action. We have read the foregoing Verified Stockholder Derivative Complaint, know the contents thereof, and authorized its filing. The contents alleged therein are true to our own knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, we believe them to be true. We further declare that we are current holders, and have been holders, of Organon & Co. common stock during the time period in which the wrongful conduct alleged and complained of occurred.

We declare under penalty of perjury that the foregoing is true and correct. Executed this 17 day of September, 2026.

[signature] AS Power of Attorney For Margaret Lapin

Benjamin Lapin

Margaret Lapin